The last case to be argued is Broker Genius v. Drew Gaynor. There are multiple independent reasons why the judgment and the permanent injunction need to be reversed. I hope I can address them all today. But the starting point is the court's interpretation of a standard copyright license, expanding that into a lifetime ban on creating similar products, whether that similarity is a copyright or much broader into the abstract ideas. The court's interpretation of that language is inconsistent with the language itself, and I'll address the specific language of the provision. But more broadly, a holistic looking at this of what the intent here, the court reached inconsistent conclusions about what Broker Genius' intent was with respect to whether it wished to preserve exclusivity over its product. It found, on the one hand, that there was this intent in this particular clause to prevent the development of competing ideas. But on the other hand, it found that  What about the other provision that uses not the formulation derivative works, but prohibits quote, attempting to derive any source code or underlying ideas or algorithms? Why isn't that aimed at something broader than just replicating copyright law? Well, two answers to that, Your Honor. First, the court's definition that we're dealing with here did not address that provision. It doesn't purport to. In the jury instruction or something else? Both in the jury instruction and as it ties back to its decision in the preliminary injunction from which this standard comes. So the jury instruction comes directly from its interpretation of that clause, the specific phrase derivative works, that it found in the May 2018 decision. And the court, if there's any doubt about that, in the JNOV decision footnote three, the court repeats again that I was interpreting the phrase derivative works, not the provision Your Honor is referring to. Secondly, the provision Your Honor is referring to still uses a different phrase and a different concept than what the court was instructing. So the court in its instruction referred to something being derived where the provision actually relates, importantly, to the underlying concept of what they're going for. A derivative work, which is the end product, is what their case was based on. It wasn't on Mr. Gaynor trying to learn something or violate the provision of affirmatively taking actions as a user prohibited by that clause. And in fact, when I asked Mr. Sherman about that at A.A. 1156 to A.A. 1158, he acknowledged that this provision does not create an independent grounds that they were bringing their claim on. He says that just learning all of these concepts, and these are very simple concepts, you would see them just by using the product. And that's not the violation that they were alleging against Mr. Gaynor. They said it only creates an independent thing if you are then creating a derivative work at the end of it. So he was not purporting for this to be an independent basis for a violation. So we have an instruction by the court on the term derivative work. And if you go into what this provision actually has in the license, Broker Genius never claims to own the underlying ideas or concepts. It is titled ownership of data and content. So not anything broader than the actual copyrightable materials. And then it defines that in the introductory clause to be the visible components, the copyrightable aspects of its product. And it then explicitly says we own a copyright to this. But the fact that the provision that I quoted to you uses the word idea, and it's cardinal that idea is not what's protected by copyright, tells you that this agreement is sweeping beyond the scope of copyright, doesn't it? The provision that you are speaking of does go beyond what their case was actually based on, which was the creation of a derivative work, as I've just said. There was no evidence that Mr. Gaynor violated the provision you are speaking of, and that's where I say Mr. Sherman acknowledged that the materials, and you can go through the checklist, are readily apparent to any user. So by the theory that simply looking at the website, seeing how it functions, without taking any extraordinary steps, that that would be a violation, Mr. Sherman rejected that. He said, no, of course, then otherwise every user seeing that it starts with an event menu and all of these things would be in violation. That's an unreasonable interpretation. So he then says, no, it's only if you thereafter create a derivative work, and then that's what the jury was instructed on by the judge. So as a result, there was no independent claim that this was a violation by Mr. Gaynor, because, again, there is a tendency to maintain exclusivity over these things. And its expansive reading of the terms of use reached the conclusion that, of course, Broker Genius wanted to prevent users from or competition, and they wanted to have exclusivity. But on the other hand, the court had already found that there was no provision in the contract to preserve such exclusivity, so that a user... I don't understand what you mean by exclusivity, and why would you say that any user would under their interpretation or the judge's interpretation be guilty of some sort of violation? They just use it. They don't create a competing product. Well, the way you ask that gets to exactly the distinction I was hoping to make, which is that the act of using it and learning the things, which is the derive, taking steps to derive something, that's not the violation that they were alleging. They were saying creating a subsequent work, a product, because of that or based on that, that's the derivative work term that they were using. They were saying it's not an independent violation by Mr. Gaynor to have used it and to learn the very basic steps that's alleged here. It's the creation of a derivative work that was the violation. When you say it's all so easy, isn't... I think one of the things you argue in your argument is that having demonstrated this product for people, potential customers, means that there's no secret. Isn't there a factual difference between what you can learn about how to create this product from seeing a 10 minute or even a half hour or an hour demonstration of this is why this is a good thing for you and using it for months under a license? There isn't. Conceptually, if you were dealing with claims, nuanced claims about how to do this, there might be, but under the fact... There was extensive testimony that there was a difference though. There's extensive testimony that these public displays were limited. No. The jury, that's not true? No. I took Mr. Sherman through this and we went through the components that are alleged to be their claim and those were the items that are demonstrated. What you're saying is there's also evidence on the other side. That's what jury trials are for. You're saying I cross-examined him and I think I made a persuasive case that what he had previously testified to wasn't really right, but isn't that what the jury is for? Not when the opponent is acknowledging the absence of evidence. They never pointed to anything that the user couldn't learn during this. More to the point, getting to the judge's determination that there is nothing in the contract that prevents the user from going to the competitors and saying, broker genius has this wonderful thing, they do this, they go step A to... Every aspect of the product was something that users were free to disclose to the competitors. Even if you are inclined to believe that there was something that a user learns only after hours of using it, that is still disclosable under this agreement. The court found that. It says that there's no prohibition on a user going to the competitor's state front and saying, after the fourth hour using the product, I learned that they have this neat little feature where you can do X, Y, and Z. There's no intent here. That was not the violation alleged here. No, but it gets to... That's a different way the agreement could have been structured that might have closed out another loophole, but that's not the wrong that was alleged by broker genius here. No, but it gets to the basic question of what was the intent in this provision, and if the intent is not to preserve the secrecy or the exclusivity over this, in other words, it's irrational to interpret this clause as saying, you as a user, you're not allowed to do something on this, but you're free to tell your other competitors about this. Let me just come back to the issue of the jury instructions. As I'm reading it, it looks as if the jury was instructed on both the derivative works and the derived ideas provision, and that Judge Stein, in using that definition, did not distinguish, in effect, between the two provisions, the derivative works and the derived provision. Under those circumstances, if the instructions fairly comported with the broader, let us say, derived provision, where's the error? Because if there was an error, and our view, obviously, is that this is a very specific prohibition on derivative works, what it was. If another provision in the contract is properly construed in the way that Judge Stein did, and if he defined them both the same, as long as that definition applies accurately and is accurately capturing the meaning of derived, what's the harm in his failure to understand that derivative works meant only a subset? Because we were not allowed to present evidence as to what derivative works mean. So when we attempted to question and elicit our interpretation of that provision, the court did not allow us to do so. That's at A125 and A126. Was there any extrinsic evidence of what derivative works meant? Pardon? Was there any extrinsic evidence of what the contract drafting as to what the parties meant by derivative works? We attempted to ask Mr. Sherman, who was the proponent of this, whether this intended to encompass only copyrightable materials, and that it was a term of art. And the court, based on its pretrial ruling, said, I'm not going to allow you to get into that. I'm asking about the contracting party's subjective intent. I'm asking about their expressed words to the other side, the sort of extrinsic evidence that sometimes is permitted in cases of ambiguity, not his subjective state of mind. Yes. Did you ask him about contract, about expressions during contract negotiations? Yes, we were not allowed to do that. Were there any contract negotiations? There were not. But no, no. But it's a form that Broker Genius created. Correct. And Mr. Gaynor signed the form without any discussion of what does this mean and what are we agreeing to here? Correct. But when we attempted to understand from Mr. Sherman whether or not a reasonable user would interpret this this way, we were not allowed to do that examination. But getting to your question about whether if there was an error or a failure to properly allow us to define what a derivative work is, would that be subsumed by the other question? And I think the answer is no, that under a harmless error, because there's a general verdict, if there was a possibility that the jury... And if he accurately defined the derived clause in a particular way, what difference does it make if he over-broadly defined the derivative works clause only to the limit of the derived clause? What difference does it make? Well, because I'm not sure that a derivative work, being a necessary component of their claim about the act of deriving, it begs the question ultimately. Because their view, again, was not that he took action while he was a user of deriving and doing something violating that provision. They said it's only later on when you create the derivative work. So the derivative work was the sine qua non... Competing work. Pardon? Competing work, in effect. Well, I mean, but that... That's the thrust of their claim. They're upset about that. They claim that in the vernacular, a work, a product that in the vernacular was derived from autopressure. Well, but that gets to the very question. In the vernacular, whether that, the provision here, which has a very specific tent in the copyright provision... Derived ideas does not, because ideas is the opposite of copyright. Right. Derivative work, I get your point. Derived ideas, by definition, first day of contract class, it's expression not ideas. Right. But then we deal with Mr. Sherman's acknowledgement that that provision was not intended to... It's not Judge Stein. I mean, if there's no discussion between the parties, if it's a lot of the judge. But if you don't know which of the two theories of the court the jury was proceeding on, then it is not harmless error. All right. You have some time for rebuttal. We'll hear from the other side. Good morning. Matt Pease, the court. Veronica Molale-Munoz, Pearl Cohen, for broker jury. Can you move the microphone a little closer? Okay. As you know, this is a 10-day trial, and defendants don't mention the standard of review for the jury's verdict or the judge's discretion. Rather, they focus on relitigating the facts. And also, many of the arguments they make were actually waived for failure to raise them in their Rule 50 motion, as required by law versus City of Syracuse. Having said that, let me address what Mr. Sherman has just been talking about, or Mr. Heisenberg has just been talking about. He cites to Mr. Sherman's testimony as evidence that plaintiffs were not seeking to use the clause that says, derive ideas in their claim. That's not true. The complaint had one paragraph that alleged both provisions in the contract derivative works and the prohibition about deriving ideas. Also, the pretrial order had one paragraph that asserted both provisions. But more importantly, Mr. Heisenberg has represented to this court that Mr. Sherman's testimony proves that plaintiffs never asserted the derive. He asked one question that's in his brief. So these provisions, the provisions that talk about deriving information, none are violated if the user is just using it in the ordinary course. Is that right? Yes. What he doesn't do is tell you what the next question says. Even in the course of doing that, they pick up, even if in the course of doing that, they pick up that the derivative works. Is that right? Again, unless they are using it to create a derivative product. The contract interpretation, that is AA1158. With regard to the contract argument, they were actually waived because they were not raised in the Rule 50B motion. And the district court properly interpreted the plain language of the contract and properly charged the jury. And to the extent that the court wants to consider the merits of Mr. Heisenberg's contract interpretation arguments, we rest on our papers. Mr. Heisenberg asserts that broker geniuses' claims, the contract claim and the misappropriation claim, both fail because the auto-pricer product was in the public domain. There is so much evidence in the record to show that that's not true. Even if you look at what Mr. Gaynor did, the proof is undeniable. The product was not in the public domain. In 2014, Mr. Gaynor had a demonstration. He went home and he drew out what he had learned and he now calls those the 2015 wire frames. They're just a sketch of the elements that he saw in the auto-pricer product. He could not build an auto-pricer. Then in 2016, he signed up as a customer of Broker Genius. He used the auto-pricer. He used it for six months. And then on January 7th, he did what he called a brain dump. And he wrote down everything he had learned as a user, as someone who had been trained for hours, as someone who had repeatedly asked technical questions of Broker Genius's technical service department. And then he, while still a customer of Broker Genius, set up SeedScots, gave his brain dump to his employees, and they started building Command Center. Mr. Gaynor lost access to his account because he was no longer pricing tickets, and Broker Genius shut it down in April. Mr. Gaynor could no longer make, he needed access because he had difficulty completing the product. In August, there was a requirement to make a group feature. They required it, but they couldn't make it. In September, Mr. Gaynor, in an email, said he wanted to get into Broker Genius's product using somebody else's credentials. In early October, they actually got somebody else's credentials. They got in, and five days later, they had completed this group feature that they had been trying to make since August. And then they launched Command Center. Mr. Heisenberg said, all these demos that customers get put the product in the public domain. Well, if that was true, why did Mr. Gaynor need to get access to the product so that he could build Command Center? The jury heard all of this evidence. There is no question. They were charged properly. There's no question that jury verdict should not be overturned. There is sufficient evidence to support it. May I just come back just to the misappropriation claim in particular? To the extent that the case was based on the derivative works provision as opposed to the derived provision, and to the extent the derivative works provision either picked up in whole or in part the language of the Copyright Act, wouldn't that theory of liability be preempted to the extent articulated as a basis for a misappropriation claim? I recognize you had a broader way of approaching this under the derived provision, but as to the derivative works component of your argument, that would have been preempted, no? Well, first of all, Mr. Heisenberg represents the Judge Stein in the Zolta case, found that this meant this provision only referred to the Stein fund. That was a trade secret case. Judge Stein was looking through the contract to find a confidentiality clause. We had pointed him to that clause, and he said, that's not a confidentiality clause that would support a trade secret case. That's all he said about it. He didn't say this case is a copyright case. And with regard to defendant's preemption argument, that's absolutely waived, because the only issue before Judge Stein was whether the defense, which was raised only days before the jury trial, was actually waived. And the standard for waiving a defense, an affirmative defense that should have been raised with the answer, the standard for that is if there's undue delay, then the judge has discretion to waive that defense. Mr. Heisenberg in his brief claims that the defense was extensively briefed. Let me show you what he means by extensively briefed. This that's colored at the end, and this. This is document 334. Now this is a letter in response to the court about the law on motions in limine. It's a complete non sequitur, and it's the first time that the law on preemption was mentioned in this case. It's dated December 23rd, and the trial started on January 2nd. Mr. Heisenberg says it's in the joint pretrial order. Is that inaccurate? There's a one line in 11 different defenses in the pretrial order. At the pretrial conference, it was not even referred to. Mr. Heisenberg did not ask for a summary judgment. It was a joint pretrial order. Why do you allow into a joint pretrial order a defense that is not properly asserted because it was not in the answer? Doesn't that waive the waiver in effect? If you agree, that's something that's to be tried in this case, and that's an issue before the court. Maybe you could have said, no, he can't raise that, but was that ever said to the court? It was never raised at the pretrial order. It was a question of law. If Mr. Heisenberg had raised it and asked for briefing or asked for any judicial decision, we would have opposed it. We knew it wasn't going to be an issue for the jury. I thought you said the jury is your point, so it doesn't really belong in the pretrial order because it's not an issue. It was slipped in there, and it was not addressed until December 23rd. If that isn't undue delay, I don't know what is. This court has already found that any court allowing a defense, in the Evans case, Evans v. Syracuse, they reversed the court, which actually allowed a defense of res judicata to be raised on a timescale the same as this. Thank you. We'll hear the rebuttal. Very quickly, if I may address a couple of points. First, with regard to the testimony about whether derive, whether that clause is separate from the derivative works clause, at AA1157 lines 1 through 4, Mr. Sherman says, of course not, it is not a violation for a judge to simply use the product and learn things from that use. And then, in particular, the provision that, or the section Ms. Munoz quoted, where he says it's not a violation, and this is on AA1158, unless they are using it to create a derivative product. So, in other words, there was no separate claim that deriving and simply learning stuff from the under a harmless error issue, if their primary interpretation was erroneous in that it is copyright, you can't assume that this secondary alternative theory of violation Wait, how can it be that the witness's statement that a provision that says attempting to derive any dot, dot, dot underlying ideas doesn't go beyond the copyright provision? How can that dictate the definition, the construction of that provision? The provision by definition uses an effective word that is anti-copyright in it. Why is it that Mr. Sherman's statement, and I don't have the full context of it, shapes what is ultimately a textual understanding of it by the judge? Well, it goes to, since he's the one who prepared this and prepared the form, he knows what it is, and if his statement is, of course you can't read it this way because otherwise every user violates it simply by, you know, using the product you learned. Basically, he doesn't mean that. The question is, do you derive that information and then use it to the disadvantage of the licensor, right? And that's what he means by derivative work. There's nothing in here that says I mean derivative work in the copyright sense. Right, he's saying of course you can't do that unless you create a derivative work. Right, but what does he mean by derivative? Their position all along is that derivative means something more in this context than it does in copyright law. Right, and that is inconsistent with the interpretation of the judge saying this provision doesn't prevent anybody from, doesn't block derivative works because a, Mr. Gaynor can go to any competitor and say create this because that's the way that they. It could have been more, you know, it could have been a bigger fence, but it still does some work. I guess what I'm trying to understand is what's the point of this pair of provisions if all they're doing is replicating statutory rights that Broker Genius already has? Because there is a important issue of whether or not when you give a copyright license to someone, you are also giving them the right, the exclusive rights that are in there. So, and that we cited the case in our brief that as a backstop you have to affirmatively disclaim giving them the further right to create derivative works. But that still would only get you to the derivative works provision. It wouldn't explain yet the need for yet a different provision using a different formulation of the verb derive. Right, and that gets to the reasonable interpretation of that. Just, I see that I'm over time, but if I could just briefly touch on the issue of damages. You can have one minute. Go ahead. One minute. Okay. The issue of whether or not there is some material, some aspect of this product that was undisclosed during these presentations, their damage model, which we challenged on an in limine motion, was the entire auto pricing, the basics, the things that are disclosed right at the up front to everyone, that everyone agreed was disclosed during these presentations. That was the basis for their damage model. And our argument was, if you're going to argue that there's some subtleties that you don't show to the public, then you have to match that to your damage model. And they continued with this mismatch of saying, we're going to present to the jury a model that the basic steps that everybody can see, that those things are the basis for demand. But at the same time, we're going to say the jury should really only find that this tiny little nuance was clipped. Thank you. Thank you. We have your argument. We'll reserve decision. The last case is on submission. I'll ask the deputy to adjourn. Thank you.